**AFFIRM; and Opinion Filed August 21, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-18-00752-CV

---

### J. KYLE BASS, ET AL., Appellants
### V.
### UNITED DEVELOPMENT FUNDING, L.P., ET AL., Appellees

---

**On Appeal from the County Court at Law No. 3**
**Dallas County, Texas**
**Trial Court Cause No. CC-17-06253-C**

---

## MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Molberg

This interlocutory appeal arises out of a lawsuit filed by appellees United Development

Funding, L.P., et al. (collectively, UDF) against J. Kyle Bass and Hayman Capital Management,

L.P., et al. (collectively, Hayman), asserting claims for business disparagement, tortious

interference with contract, tortious interference with business relationships, and civil conspiracy

to commit these torts, based on statements Hayman wrote and published on the internet about

UDF's business. Hayman filed a motion to dismiss UDF's claims pursuant to the Texas Citizens

Participation Act, TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (TCPA). The trial court

denied Hayman's motion to dismiss.

Hayman raises six issues on appeal. In its first five issues, Hayman argues UDF failed to

establish by clear and specific evidence a prima facie case for certain of the essential elements of

its claims. In its sixth issue, Hayman contends the trial court erred by striking evidence attached to Hayman's post-hearing brief. For the reasons that follow, we conclude UDF carried its burden under the TCPA to establish a prima facie case for the challenged essential elements of its claims preserved for our review.[1] We further conclude the trial court did not err by striking evidence attached to Hayman's post-hearing brief. Accordingly, we affirm the trial court's order.

## BACKGROUND

### Procedural Background

UDF filed suit against Hayman on November 28, 2017, asserting claims for business disparagement, tortious interference with contract, tortious interference with business relationships, civil conspiracy to disparage UDF's business, civil conspiracy to tortiously interfere with UDF's contracts, and civil conspiracy to tortiously interfere with UDF's prospective contracts and business relationships. UDF requested actual and exemplary damages, as well as an award of its attorney's fees.

On January 26, 2018, Hayman filed a motion to dismiss UDF's lawsuit under the TCPA. As relevant to the issues before us, Hayman argued that UDF did not meet its burden under section 27.005(c) of the TCPA to establish by clear and specific evidence a prima facie case for the actual malice element of its claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). In its reply brief on its motion to dismiss, Hayman additionally argued that UDF did not establish a prima facie case that Hayman's statements were false or that Hayman's statements caused UDF's damages.

---

[1] For the first time on appeal, Hayman argues: the only contracts identified by UDF are "those between UDF and certain of UDF's lenders"; UDF "point[ed] to no evidence" that Hayman's actions caused their lender to breach a contract—rather, UDF only identified modifications of loan agreements between UDF and its lenders; and evidence that certain lenders did not extend new loans to UDF after their existing credit lines expired "is not evidence of interference with any *existing* contracts." In its motion to dismiss, Hayman challenged only the essential elements of actual malice, causation, and damages; therefore, Hayman's complaints on appeal are so limited.

–2–

In its brief in opposition to Hayman's motion to dismiss, UDF asserted that its petition as well as numerous affidavits—from its business counterparts, employees, investors, and a forensic accounting expert specializing in "areas that are the subject of [Hayman's] false statements"— provided detailed allegations and evidence far exceeding the minimum quantum of evidence necessary to state a prima facie case under the TCPA.

Following a May 21, 2018 hearing on Hayman's motion, Hayman filed an amended post-hearing brief on May 30, 2018, attaching additional evidence, including a supplemental affidavit of Bass. UDF moved to strike Hayman's amended post-hearing brief and Bass' supplemental affidavit on the grounds (1) they were filed outside of the deadlines and briefing schedule provided in the parties' Rule 11 agreement; (2) they were not served and filed at least three days prior to the scheduled hearing as required by Dallas Local Rule 2.09; (3) Bass' supplemental affidavit constituted new evidence filed after the hearing on Hayman's motion to dismiss; and (4) Hayman's submission of new evidence and arguments after the hearing was prejudicial to UDF.

On June 11, 2018, the trial court signed an order denying Hayman's motion to dismiss. In its order, the trial court concluded Hayman's amended post-hearing brief and the "evidence in the [brief]" were improperly submitted by Hayman "without authorization after the hearing." Accordingly, the trial court granted UDF's motion to strike the evidence in Hayman's amended post-hearing brief, but the trial court did not strike the amended post-hearing brief itself from the record.

**UDF's Prima Facie Evidence**

This is not a case in which the plaintiff merely provided the "minimum quantum of evidence" necessary to satisfy its burden to state a prima facie case for its claims. *See In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). Rather, the prodigious quantity of details and specific fact allegations in UDF's pleadings and affidavits that support a rational inference establishing the

challenged elements is much like a restaurant menu with too many offerings—the difficulty lies in choosing which examples, and what level of detail, to include in our opinion. In concluding UDF satisfied its burden under the TCPA, we reviewed over 2,000 pages of pleadings, affidavits, and evidence, such as copies of Hayman's internet posts and statements, news and social media articles, correspondence, contracts and agreements, contract modification agreements, and SEC filings. As we must, we considered these pleadings, affidavits, and evidence in a light most favorable to UDF, the nonmovant. *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 424 (Tex. App.—Dallas 2019, pet. denied).

UDF's sixty-one page petition, and affidavits attached to its response to Hayman's motion to dismiss, quote extensively from Hayman's internet posts and they provide numerous detailed descriptions of Hayman's alleged false statements, including dates, titles, and headlines of the posts, and the manner in which Hayman circulated its statements on the internet and among various specifically identified news and social media outlets, further publicly proliferating Hayman's indictments of UDF's business. UDF's pleadings and affidavits explain how and why Hayman's statements were false; illustrate and describe how and why Hayman made the false statements knowingly or recklessly; and chronicle the economic and business damages and losses UDF sustained as a direct result of Hayman's false statements. Evidentiary documentation supporting UDF's fact allegations and affidavit testimony was attached to UDF's response to Hayman's motion to dismiss, and included, among other things, copies of: Hayman's posts and statements subject of this lawsuit; social media posts by other organizations, as well as news articles reporting on Hayman's statements; UDF's SEC filings; invoices; billing statements; contracts and agreements between UDF and various of its business partners and associates, customers, and lenders; modifications to and terminations of such contracts and agreements resulting from

Hayman's allegedly false and misleading statements; and correspondence reflecting the same. In this opinion, we describe only some of those supernumerary fact allegations and evidence.

### The Allegations Underlying UDF's Claims

We draw the following facts from the pleadings and from evidence adduced in connection with Hayman's motion to dismiss and UDF's response thereto. *See Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 685 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). For purposes of this appeal, we accept UDF's pleading allegations and evidence as true.

This lawsuit derives from a series of internet posts written and published by Hayman, a hedge fund registered with the United States Securities and Exchange Commission (SEC), about the viability and legitimacy of the business of UDF, a residential real estate lender. Hayman purchases and sells securities and other financial instruments for institutional investors and high net worth individuals. Bass is Hayman's founder and chief investment officer. Bass and Hayman utilize short selling as an investment strategy.[2] The gravamen of UDF's claims is that Hayman published and disseminated defamatory, false, and misleading statements about UDF's business in order to drive down UDF's stock price and profit from several large short positions it had taken in UDF stock.

UDF is a family of funds that lends money to residential real estate developers and homebuilders in Texas and other states. Several UDF entities are or were registered with the SEC or were listed on the NASDAQ stock exchange. According to UDF's petition:

> The UDF family was founded in 2003 to provide investors an opportunity to diversify their portfolios with unique and sound investments in affordable residential real estate. The UDF Family enjoyed steady growth and provided

---

[2] Short selling is a highly speculative investment strategy which allows investors to profit from a decrease in the value of a stock or security. In a short sale, an investor "borrows" shares of a stock that the investor believes will decrease in value by a set future date. The investor sells the borrowed shares to buyers willing to pay the market price and retains the cash proceeds from the sale, hoping that the stock price will decline and provide an opportunity for the investor to purchase the stock at a lower price than the original sales price. The difference between the higher original sales price and the subsequent lower purchase price is profit to the short-seller.

–5–

consistent returns to investors for over a decade while financing hundreds of millions of dollars in successful housing, construction and development projects for leading developers in the State of Texas and elsewhere.

UDF alleges, "Bass made a name for himself as an investor in 2008 when the large short positions he had taken against the housing market proved to be hugely profitable for his investors." In subsequent years, however, Bass' investments incurred losses. According to UDF, "[b]y 2015, a steady stream of investors were withdrawing money from Bass' funds due to poor returns." To stem the exodus of Hayman investors, UDF claims Hayman took "voluminous" short positions in UDF stock, and then engaged in a campaign to spread false and damaging information about UDF to the public marketplace, to UDF's business associates, and to governmental authorities with the objective of driving down the price of UDF stock:

> [Hayman and Bass] chose to engage in what is known as a "short-and-distort" scheme. In this illegal scheme, the short seller spreads false and damaging information about the target company it is betting against in order to harm the business and its stock price. [Hayman and Bass] chose UDF as their target for their scheme.

> [In] 2015, [Hayman and Bass] opened an enormous short position in UDF. [Hayman and Bass] then attacked UDF in a series of false internet posts that were made anonymously . . . . The heart of [their] attack was that UDF was not a legitimate real estate lending and development business, but rather a billion-dollar house of cards that had been built up through a massive Ponzi scheme. [They] purported to have done extensive research to back their false claims that UDF had no genuine financial ability to carry on its business and that it was just a matter of time before creditors and investors were stuck with the fallout of UDF's insolvency.

UDF alleges that Hayman and Bass posted this false information on the internet, disseminated the false information to the media, and provided the false information "directly to UDF's business partners—lenders, borrowers, accountants, title companies, etc.—that [they] knew were necessary to UDF's continued success." UDF contends that as a result of Hayman's false statements:

- UDF sustained hundreds of millions of dollars in damages;

- UDF suffered a sudden and severe loss of access to credit and capital markets necessary for operation of its business;

- UDF was forced to pay off loans and liquidate assets;

- UDF lost builder and developer customers and future investors; and

- agreements and plans for real estate development projects between UDF and its customers and business associates fell through.

When UDF's stock price dropped as a result of Hayman's false statements,[3] Hayman and Bass sold their short positions in UDF stock at a profit of $60 million or more.

**Hayman's Short Positions in UDF**

Hayman contends that Parker Lewis, a Hayman analyst, began conducting research into real estate investment trusts (REITs)[4] in 2014, to identify potential investment opportunities. Lewis' research led him to probe the business and financial circumstances of various UDF entities. According to Hayman, Lewis uncovered "a number of what appeared to be financial irregularities" and "certain facts or patterns that raised reasonable questions regarding general solvency concerns (and specifically concerning the ability to timely pay debts) regarding certain significant groups of related borrowers of certain UDF Entities [or] certain UDF Entities themselves."

In 2015, Hayman opened an "enormous" short position against UDF. Outstanding short positions against UDF IV—an entity in the UDF family of funds—generally averaged around 80,000 shares. Prior to launching its public campaign attacking UDF's business on December 10,

---

[3] A December 2018 Dallas Morning News article corroborated UDF's allegations, reporting, "Over the last 13 years, United Development has raised more than $1 billion from almost 27,000 investors. Despite those big numbers, the company pretty much flew below the radar until earlier this month. That's when a campaign of anonymous Internet posts and unsigned letters to the media began accusing United Development of improper dealing and defrauding investors–something the company denies. . . . The Internet chatter has been enough to plunge the stock price on one of United Development's publicly traded real estate investment trusts–UDF IV–by about 50 percent. . . . United Development claims that slamming its stock price was the intention of its accusers. The value of the company's securities suffered more than a $350 million decline in value."

[4] A real estate investment trust finances or owns and operates income-producing real estate. REITs allow investors to earn a portion of the income produced by income-producing real estate. Many REITs are registered with the SEC and traded on a public stock exchange.

2015, however, Hayman took an astonishing short position in excess of 4,000,000 shares against UDF IV.

## Hayman's Anonymous Internet Posts

On December 9, 2015, Hayman—using the pseudonym "Ernest Poole"—created an anonymous blogger profile, "Investors for Truth" (IFT), on the investment website www.hvst.com. On IFT's web page the following day (after assuming a large short position against UDF IV), Hayman anonymously published the first of a number of posts falsely declaring or creating a false impression that UDF was an illegitimate, "Ponzi-like real estate scheme" on the verge of collapse, and that "investors [would be] left holding the bag." Titled, "A Texas-Sized Scheme Exposing the Darkest Corner of the REIT Business, United Development Funding (UDF)," Hayman's post began, "Only when the tide goes out do you discover who's been swimming naked." According to UDF, the article falsely asserted, among other things, that:

- UDF had characteristics emblematic of a "Ponzi scheme."

- New investor capital was being used to provide returns to old UDF investors.

- UDF's so-called "developments loans" were collateralized by real estate with no actual development "as much as" ten years after the loans were issued.

- There were "sinister" explanations for UDF's business practices: "Where did all the money go if not to developments?"

- UDF was generating non-legitimate, fictitious, purported returns to "maintain the scheme."

- The "cracks in UDF's façade [were] starting to appear."

- UDF was "underwater" because there was no development for numerous UDF loans.

- UDF's investors, including "retail investors and retirees," were "gullible" "victims" of "one of the most egregious cases" of a business model in which "poor investments are masked by additional capital raises."

–8–

Hayman's December 10 post included an anonymous letter it sent to Whitley Penn, UDF's former auditor, on December 4, 2015 (the Penn letter). The Penn letter "essentially falsely accuse[d] Whitley Penn of being a conspirator with UDF and disseminating false information to investors and the public." The letter included a laundry list of "**Red Flags**" that implied Whitley Penn either was intentionally deceived by UDF and failed to catch the accounting irregularities, or Whitley Penn was actively conspiring with UDF to deceive investors.[5]

Additional anonymous internet posts published by Hayman on December 11 and December 15, 2015 were titled:

- "**United Development Funding (UDF) One Example of Many: How The Scheme Works, from One UDF Fund to the Next**," and

- "**Reaching Across the Aisle of Your Private Jet Does Not Equal an Arms' Length Transaction United Development Funding (UDF)**."

Claiming that "UDF's management began deceiving its fund investors essentially from the beginning," Hayman's December 11 and 15 posts echoed the narrative that UDF was running a Ponzi scheme, UDF loan proceeds were being misappropriated, and UDF was issuing loans for real estate development projects that never occurred.

A considerable portion of Hayman's posts targeted Centurion—Hayman's largest group of borrower entities—charging that Centurion was not creditworthy, Centurion and UDF had an illicit relationship, and Centurion was not engaged in bona fide real estate development. According to UDF, Hayman prevaricated that Centurion was part of UDF's scheme to misappropriate money from shareholders by issuing loans for sham real estate development projects that never materialized. Declaring that these loans were "collateralized by land that has never been developed (for years, not quarters)," Hayman predicated that Centurion did not have the ability to pay its

---

[5] Unless otherwise indicated, italicized, bolded, and underlined text in this opinion is in the original.

UDF loans, stating, "100% of UDF IV loans are classified as fully collectable, which is likely a material misrepresentation if the largest borrower is insolvent."

For example, Hayman claimed, "Centurion has owned [Shahan Prairie] for over 10 years and there is no sign of development activity." Posting two photographs of undeveloped land designated as "Shahan Prairie Estates," Hayman dissembled, "This is the land that has served as collateral for multiple UDF loans issued by various UDF entities; these pictures of the land acquired by Centurion in 2004 were taken in November 2015." Underneath the photographs, Hayman posed the rhetorical question, "If you were a developer borrowing at interest rates of 13%, wouldn't you be developing real estate as fast as possible?"

In its fourteen-page post, "**Reaching Across the Aisle of Your Private Jet Does Not Equal an Arm's Length Transaction United Development Funding (UDF)**," Hayman claimed:

> Loans to Centurion regularly (i) do not generate any cash (principal or interest), (ii) are extended without any extension fees (try that one with a bank), and (iii) accrue larger and larger balances (year after year). . . . *Are investors (and the authorities) really going to believe that loans that behave in this manner are arm's length?*

Raising "further questions about management credibility," Hayman described UDF's Form 8-K, filed with the SEC on December 14, 2015, as:

> [M]anagement's rambling response attempting to further lull investors with the old saw, "they just don't understand our business." Management has been misleading investors for years, and its response continues further down the path of deception. Not only were management's responses deceptive; in some cases, the responses were comical.

In a January 2016 article titled, "ANATOMY OF A BILLION DOLLAR HOUSE OF CARDS THE CASE AGAINST UDF IV," Hayman continued its drumbeat of accusations that UDF was running a Ponzi scheme; UDF was issuing loans that did not generate any cash income; UDF was funneling new capital to repay existing investors; UDF's loans were "dangerously concentrated" with two borrowers which were "in financial distress"; UDF had an "undisclosed

business relationship" with the principal executive of Centurion in which "the economics [do] not add up"; and UDF was funding so-called real estate developments when no developing activities actually were occurring. Large bolded headlines within the article included:

- "**THE UDF STRUCTURE IS A BILLION DOLLAR PROBLEM**"

- "**Shareholders in UDF IV and UDF's other real estate investment trusts (REITs) are being victimized by UDF management's Ponzi-like real estate scheme**"

- "**PARTICIPANTS IN UDF'S PONZI-LIKE REAL ESTATE SCHEME**"

- "**HOW CAPITAL IS FUNNELED TO REPAY EXISTING INVESTORS**"

- "**DANGEROUSLY CONCENTRATED LOAN PORTFOLIO**"

- "**RELATIONSHIPS** (sic) **GOES FAR BEYOND THAT OF LENDER (UDF) AND BORROWER (MOAYEDI)**"

- "**DEVELOPMENT ACTIVITIES ARE NOT TAKING PLACE AT MANY UDF-FUNDED SITES**"

- "**CRACKS IN UDF'S FAÇADE ARE STARTING TO SHOW**"

- "**UDF'S SCHEME HAS NEGATIVE IMPLICATIONS FOR ITS SHAREHOLDERS**"

**Hayman Launches www.UDFEXPOSED.com**

On February 4, 2016, Hayman launched a newly created website, UDFEXPOSED.com. Unlike its previous anonymous posts, Hayman's UDFEXPOSED.com posts were openly published by Hayman Capital Management, L.P. The website included a "Letter from Kyle Bass," addressed to "Dear Reader." Bass' letter stated:

- "Our research showed that **UDF exhibited characteristics consistent with a Ponzi scheme,** the size and scope of which exceeded a billion dollars."

- "**UDF is using new investor money to pay existing investors**" and "perpetuating a Ponzi-like real estate scheme across multiple funds."

- "**UDF management is misleading investors.**"

–11–

- **"UDF management is preying on 'Mom and Pop' retail investors"** and "is using new investors' money to make payments to existing investors, and thereby perpetuating the scheme."

- "After years of mismanagement, the UDF structure has begun to implode."

- "Today, as a consequence of mismanagement and concealed losses, UDF faces **significant bankruptcy risk,** which would leave its shares virtually worthless."

- "The research on this website exposes how a Texas real estate developer built a billion dollar house of cards and why it is now on the verge of collapse."

Sandbagging UDF with additional accusations concerning its business and business partners, Hayman's UDFEXPOSED.com posts recycled the same themes:

- UDF's shareholders were "victim[s]" of its "Ponzi-like real estate scheme."

- UDF had been "misleading investors for years."

- UDF business model, including "[u]sing cash from new investors to repay existing investors," was "not sound."

- Transactions with Centurion, UDF's largest borrower, were not at arms' length and were an integral component of UDF's fraudulent business scheme.

- Loans to Centurion were "almost always not repaid."

- Loans to Centurion "typically d[id] not generate any actual cash income."

- Hayman's conclusions were "[b]ased on a thorough examination of SEC filings, county records and various court documents."

### UDF's Petition and Affidavits Point to Clear and Specific Facts Showing Hayman's Statements and Implications Were False

Pointing to specific fact allegations in its petition and in affidavits and evidence attached to its response to Hayman's motion to dismiss, UDF asserts the statements and the implications in Hayman's internet posts were false.[6]  Contrary to Hayman's prevarications, UDF maintains that "[n]one of UDF's returns were fictitious, UDF was not involved in any unlawful fraudulent scheme

---

[6] UDF's pleadings, affidavits, and SEC filings provide voluminous detailed fact allegations and evidence describing and explaining how and why Hayman's statements were false.  In this opinion, we describe only some of those copious fact allegations and evidence.

to generate fictitious returns, and investor money was not misappropriated but rather used in furtherance of legitimate business opportunities typically secured by bona fide real estate."

In a ninety-two page affidavit accompanying UDF's response to Hayman's motion to dismiss, Hollis M. Greenlaw, Chief Executive Officer (CEO) of UDF IV and a director of various UDF entities, averred that UDF's SEC filings and other public records unequivocally demonstrated UDF loans generated actual cash over the life of the loan. Greenlaw attested:

> . . . UDF's public filings show cash receipts which were applied to principal and interest repayments. For example, **UDF IV's SEC filings showed that it was generating significant amounts of cash, and, in fact, its generation of cash had been steadily increasing.** [UDF's] 2014 10-K contain[s] a table listing each outstanding loan and the cash receipts that were applied to principal (which includes compounded interest). UDF IV disclosed that its 2012 cash receipts for its outstanding loan portfolio were approximately $26 million, which increased to approximately $100 million in 2013 and then to approximately $152 million in 2014. However, this table only shows a subset of UDF IV's total cash receipts since it does not include cash receipts on loans that were repaid in full during 2012, 2013 and 2014. **Total cash receipts applied to principal of approximately $45 million in 2012, $135 million in 2013 and $173 million in 2014 are shown in the Consolidated Statement of Cash Flows on page F-7 of UDF IV's 2014 10-K**. . . . **Public records (which Bass swears he researched) also show recorded UDF lien releases** from pod, lot and home sales that **generally resulted in cash payments to UDF**. **[Hayman] also ignored the parts of UDF's business**, finished lot loans and homebuilding loans, **that generate current cash**. **[Hayman] only focused on the part of UDF's business that naturally consumes cash** – acquisition and development loans.[7]

In a twenty-four page affidavit attached to UDF's response to Hayman's motion to dismiss, Dale Kitchens, a forensic accounting expert, averred:

> [Hayman's] assertion that UDF's business was operating as a Ponzi scheme, or in a comparable Ponzi-like manner, was false. UDF's business was <u>not</u> masking or engaging in financial irregularities typical of a Ponzi scheme. [Hayman] did <u>not</u> show the existence of "purported returns" (i.e., fictitious returns), nor was UDF's business generating fictitious returns typical of a Ponzi scheme. . . . It was <u>not</u> true that, as stated in the "Letter from Kyle Bass," UDF's business was a billion dollar house of cards, and UDF's

---

[7] Emphasis added.

business was not on the verge of collapse such that it faced significant bankruptcy risk that would leave the shares of investors virtually worthless.

Kitchens provided extensive detail in support of his testimony, including statements in UDF's SEC filings. For example, Kitchens repudiated Hayman's assertion that UDF was not generating cash receipts and instead accrued a fictional form of interest that the "authorities" would reject. To the contrary, Kitchens averred, "***UDF IV's SEC filings showed that it was in fact generating cash, and, moreover, its generation of cash had been steadily increasing.***" Kitchens continued:

> [O]n pages 56–59 of UDF IV's 10-K, UDF IV disclosed that its 2012 cash receipts for its loan portfolio were approximately $25 million, then increased to approximately $100 million in 2013, then increased to approximately $152 million in 2014. (Annex 9, at 56-59.) As for distributions to the investors in UDF IV, page F-18 of the same 10-K disclosed that UDF IV made approximately $51 million in distributions to investors in 2014, the source of which was approximately $42 million in cash from operations and approximately $9 million in borrowings under credit facilities. (Id. at F-18.) None of the funding of distributions came from offering proceeds from new investors (though there would be nothing indicative of a Ponzi scheme if funding did come in part from offering proceeds, as that is an ordinary feature of blind pool offerings for real estate investment trusts). [Footnote omitted]

Also contrary to the insinuations and statements in Hayman's posts, specific fact allegations in UDF's petition, affidavits, and SEC filings show Whitley Penn did not resign as UDF's auditor due to financial irregularities and misconduct by UDF. UDF IV's November 24, 2015 form 8-K filed with the SEC disclosed that Whitley Penn resigned as UDF's auditor on November 19, 2015. Whitley Penn submitted a letter to the SEC confirming "there were no disagreements between [UDF] and Whitley Penn on any matters of accounting principles or practice, financial statement disclosure or auditing scope or procedure."

According to Mehrdad Moayedi, Centurion's CEO, UDF, and Kitchens, Centurion was not insolvent and was able to service its debt and interest expenses to UDF.

In his affidavit attached to UDF's response to Hayman's motion to dismiss, Moayedi averred:

- "Since 1990, Centurion has developed well over 25,000 single-family lots in dozens of premier communities in North Texas."

- "Delivering award-winning communities with impeccable amenities such as parks, golf courses, water park themes, and hiking and biking trails, Centurion has successfully designed master-planned communities that have been recognized across the real estate industry."

- "Centurion has completed or is in the process of completing several high-profile developments including: (i) the River Walk at Central Park in the Town of Flower Mound, which is a 158 acre mixed-use development comprising single-family and multi-family homes . . . ., (ii) the remodel of the historic Statler Hotel in downtown Dallas and the restoration of the Dallas Public Library . . . ., (iii) The Residences At The Stoneleigh, . . . featuring customized condominiums. Centurion's current projects include Mercer Crossing in Farmers Branch, which is planned to feature 2 hotels, 3500 multi-family units, and retail shopping. That project will also include over 800 single-family home sites for townhomes and residential villas, 180,000 square feet of commercial services, and a reserved 48-acres for a future office campus."

- "Over many years, Centurion has worked with dozens of lenders to secure capital necessary for development. Those lenders include traditional bank lenders as well as alternative sources of capital from non-bank lenders, such as UDF. UDF is not the only non-bank lender from which Centurion has borrowed."

- "The loans [from UDF] were at market rate. Centurion was not, and is not insolvent. No loan proceeds were misappropriated. Centurion has had no involvement in any Ponzi scheme."

- "On its website, Hayman Capital asserted that UDF's loans to Centurion were 'irregular' because the loans 'do not generate any cash (principal or interest).' [footnote omitted] . . . This assertion was and continues to be incorrect. In truth, loans from UDF to Centurion generated cash."

UDF's petition alleges that Hayman "knew that Centurion was not insolvent. Bass himself wanted to do business with Centurion and knew that Centurion was one of the most successful developers in Texas." Kitchens' testimony corroborates UDF's fact allegations and Moayedi's testimony: "UDF's loans, including to its largest borrower, Centurion, did generate cash receipts. Money did go to development. The collateral was genuine and in the process of development."

Likewise, clear and specific fact allegations in UDF's petition refute Hayman's incriminations about the non-existence of development on UDF-funded real estate projects. UDF asseverates that Hayman intented to delude investors about the purported lack of Centurion's development activity when publicly available information showed that development, in fact, was taking place:

> [In its December 11, 2015 post, Hayman] attached a photo of Shahan Prairie purporting to prove the lack of development activity, but the photo only showed a tiny fraction of the 102 acre site. In truth, **publicly available aerial photos showed road cuts and grading that would cause knowledgeable persons like [Hayman] to understand that development work had been done**. [Hayman] obviously meant to create a **false appearance by posting a single photo of a 102 acre development from the road rather than the aerial photo of the entire site**.

> **[Other] public records also showed entitlement activity was underway for the development, including the creation of Shahan Prairie's Water Control Improvement District**. The very same documents [Hayman] cite[s] in their presentation show the recording of documents forming the water district, which created municipal reimbursement entitlements for Centurion of over $16 million. Those same documents also show an assignment of these entitlements to UDF as collateral for its loan.[8]

### The Fallout

UDF's petition and affidavits and documents attached to its response to Hayman's motion to dismiss provide detailed fact allegations and evidence supporting a rational inference that Hayman's false and disparaging statements proximately caused actual damages to UDF in the form of loss of current and future lines of credit, loss of investors, loss of its stock value, loss of business partners and customers, loss of present and future business agreements and transactions, and out-of-pocket costs incurred to stem and contain the damage caused by Hayman's statements, including UDF's ability to continue as an ongoing business enterprise.

*Hayman's Statements Caused UDF to Lose Existing and Future Lines of*
*Credit and Loans Necessary for Operation of Its Business,*
*As Well As Profit Participation Interests In Some Loans*

---

[8] Emphasis added.

Alice Anne Brown was UDF's lead banker at Legacy Texas Bank (the Bank), and she had the "closest relationship with UDF" at the Bank. Brown's affidavit, attached to UDF's response to Hayman's motion to dismiss, provides clear and specific evidence not only that Hayman's statements were false, but also that UDF sustained damages as a direct result of the false statements. Brown averred that prior to Hayman's post, "[t]he Bank (including [Brown]) considered UDF to be a good credit risk and provided UDF funds on good terms." Brown attested, "As of December 10, 2015, UDF III and UDF IV each had a Ten Million Dollar Term Loan and a Five Million Dollar revolving line of credit with the Bank."

The "strong negative" statements about UDF's business in Hayman's December 10, 2015 post, however, caused "widespread concern" at the Bank. Although the "allegations in [Hayman's] post were not consistent with [Brown's] experience with and knowledge of UDF's business" and Brown "was aware of no information that would support the assertions made by Bass":

> **[Hayman's] post caused the Bank's entire relationship with UDF to come crashing down virtually overnight**. The post also caused a panic at the Bank, as the allegations in the post implied the **Bank's loan collateral was worthless and UDF would not pay its debt to the Bank**.[9]

Brown continued:

> **In direct response to the negative statements in the post**[, the] Bank **decided not to lend any additional amounts** to UDF, and further decided to wind down and **terminate any outstanding loans and credit lines with UDF**.[10]

Brown averred, "It was my belief that Bass had taken facts about UDF's business that were not unusual or improper, and had distorted and misrepresented them to create the impression UDF's business was operating in a fraudulent manner based on phony real estate developments that did

---

[9] Emphasis added.

[10] Emphasis added.

not generate legitimate returns." Brown attested that after investigating and re-appraising the collateral for UDF's loans, the Bank concluded the loans were not at risk for default, and UDF paid off significant portions of the loans before April 2017.

Greenlaw, UDF IV's CEO, averred:[11]

- "Right after [Hayman's] attack began, the banks changed their dealings with UDF significantly as part of an overall effort to terminate their relationship with UDF. Unused lines of credit were cancelled. Banks demanded 100% of proceeds from sale of collateral to pay down their debt instead of allowing UDF to keep 40–50% to reinvest and operate its business. Banks refused extensions and/or drastically changed the terms of such extensions (only granting a few months, charging higher fees and requiring additional appraisals and other due diligence and reporting by UDF)."

- "[I]n late 2014 or early 2015, a researcher who worked for [Hayman] contacted Waterfall Finance 4, LLC [one of UDF's lenders] and asked whether they had any issues with the collateral for the Waterfall $35 million loan to UDF IV, and that Waterfall told them they had no issues whatsoever with UDF IV or the loan collateral."

"As of 9/30/15, the UDF Funds had outstanding bank loan balances and notes payable to Waterfall of $217,366,164. The interest rates charged to UDF by banks ranged from 4.125% to 7.25%, and the Waterfall notes charged approximately10%. The $35 million loan from Waterfall was used to finance a tender for UDF IV shares in conjunction with its listing on Nasdaq, so it was not used to re-lend. The $15 million loan from Waterfall was used to re-lend. UDF IV's average rate paid on its bank loans was 4.40% excluding Waterfall. These numbers were substantially the same as of December 10, 2015."

"As a result of Defendants' attacks, by December 31, 2017, UDF's outstanding bank loans and [notes payable to] Waterfall [had] been reduced from $217,366,164 at September 30, 2015 to $5,941,116. Unused lines of credit totaling over $80 million were cancelled. Just the simple interest lost from the previously deployed capital is at least $18 million per year (UDF's average spread of approximately 8.6% on this capital that disappeared due to Defendants' attack). This loss of interest injured Plaintiffs UMT [United Mortgage Trust] and UDF I, UDF III, UDF IV and UDF V. Waterfall accelerated repayments of its loans and increased its interest rate from 10% to 12.5%, causing UDF IV to incur additional interest costs to carry these loans until they were repaid."

---

[11] Copies of loan agreements, loan documents, loan modification agreements, correspondence, SEC filings, balance sheets, news articles, photographs, public documents, and reports referenced by Greenlaw, as well as copies of Hayman's posts and statements, were attached to his affidavit.

- "Additionally, the loss of the banks' willingness to do business with UDF prevented UDF from taking out new loans with the banks to fund the new borrower funding needs UDF had in the pipeline as of December 2015. Several banks had expressed an interest in expanding their credit to UDF prior to the attack."

"For example, as to Legacy Bank, prior to the attacks, UDF III had a $10 million revolving term loan and a $5 million revolving line of credit. These had been in place since March, 2014, and had been renewed on September 21, 2015 through January 1 and March 21, 2016. . . . Prior to [Hayman's] initial posts, the parties had been discussing renewal terms to again continue the loans in the ordinary course of business[.]"

"All that changed immediately after [Hayman's] first posts. Legacy contacted UDF about [Hayman's] postings on December 11, 2015, and bank executives came to UDF's offices for a meeting on December 15, 2015 . . . . They were specifically concerned about the Ponzi allegations and the attacks on UDF's collateral."

"On December 18, 2015, Legacy informed UDF that 'recent news articles regarding the family of UDF entities have raised issues of concern within our organization.' Legacy did not offer renewals of the loans. Instead, on December 29, 2015, Legacy sent documents changing the terms so that UDF III could not make any more draws on the loan or line of credit and instead required repayment."

- "Origin Bank was UDF IV's largest lender at the time of Defendants' attacks. UDF IV had three revolving loans with Origin with note amounts totaling $70 million and outstanding balances totaling approximately $52 million as of September 30, 2015. The loans had been in place since 2010 and 2013, and had been renewed in mid-2015."

"The week after Defendants' first postings, Origin expressed its concern about the postings, specifically the Ponzi allegations and the attacks on UDF's collateral. In an email sent on December 18, 2015, Origin listed its new terms. Origin reduced its loan commitment from $70 million to $47.6 million and required 100% of cash from sales of collateral to go to the bank. The bank also required additional appraisals of collateral at UDF's expense. These changes are reflected in fully-executed loan modification agreements[.]"

- "Independent Bank was another UDF IV lender at the time of the attack. UDF IV had a $15 million revolving loan with an outstanding balance of approximately $13.8 million at September 30, 2015 that was due for renewal on December 5, 2015. . . . Jonathan Sparling was the bank officer communicating with UDF. The bank offered UDF IV renewal terms and discussed increasing the amount. On December 11, 2015[,] UDF IV told the bank that its lawyers were working on renewal documents and that it wanted to move forward on the offered terms."

"However, on December 11, 2015, the bank suddenly changed the terms: the loan would no longer be revolving – the balance of $12.8 million would need to be paid down and 100% of the proceeds of a pending $5 million borrower repayment would be applied to the loan balance. UDF asked for better terms, but the bank rejected. The bank told us they could no longer do business with UDF due to 'pressure from investors' regarding [Hayman's] allegations. Mr. Sparling told UDF that the bank was getting questions from analysts about its UDF loans. A loan modification agreement was executed on December 31, 2015, which provided for no further advances, a $6.3 million pay down of principal, and 100% net proceeds of all future borrower repayments going to the bank."

- "UDF also had profit participation interests included in some of its loans. UDF lost its profit participation in at least two loans due to Defendants' attacks. An entity called UDF IV Woodcreek, Inc. (a UDF IV subsidiary) was a party to a Profits Interest Agreement with Southstar Woodcreek Developer, LLC (a Florida developer operating in Texas). The liquidity crunch Bass created caused a refinancing of this debt, and as a result, UDF had to give up its profit participation interest. UDF IV released its interest in this profits agreement on March 30, 2016 and to the best of my knowledge, lost millions of dollars from the release of the profits agreement."

*Hayman's Statements Cause UDF to Incur Out-of-Pocket Costs*

In his affidavit, Greenlaw averred that after Hayman published its December 10 article, "investors, financial advisors, banks, other lenders and journalists immediately started calling and emailing UDF, demanding responses to the allegations." Each new post by Hayman caused an avalanche of phone calls and emails to UDF about Hayman's statements "that UDF was a fraudulent 'Ponzi' scheme, its collateral worthless, and that UDF was at risk from having too many loans concentrated with Centurion, an insolvent borrower."

Greenlaw attested that UDF was compelled to hire a public relations firm and various attorneys, law firms, and accounting firms to handle different specified aspects of the fallout resulting from Hayman's false and disparaging descriptions of UDF's business. In addition to these out-of-pocket costs, UDF "incurred increased insurance and accounting expenses." UDF also was "forced to pay legal bills submitted by banks for the research done to confirm their collateral in response to Bass' allegations," as well as reimburse attorney's fees incurred by one of

its lenders in connection with loan modification agreements it "required as a direct result of [Hayman's] attack."[12]

*Hayman's Statements Caused UDF to Lose "Current and Future Investors"*

Greenlaw attested that UDF raised over $1 billion in investor capital between 2003 and December 2015. Hayman's actions upended another capital raise, which "would have provided $1 billion in new capital to UDF." Specifically, "UDF V sought to sell 37,500,000 shares of beneficial interest for $20.00 per share and 13,157,895 shares of beneficial interest through DRIP for $19 per share for total offering proceeds of $1,000,000,000."

*Hayman's Statements Caused UDF to Lose Business*

Greenlaw averred, "[Hayman's] actions also caused its existing borrowers, including but not limited to Centurion, Harris & Straub Development Partners, David Weekley Homes and affiliates of True Homes, to reduce their existing and future business with [UDF]." One example described by Greenlaw involved a December 2014 loan by UDF V to Rosehill Reserve, Harrigan Development Partners, and Thomas Hargrove:

> UDF V agreed to provide up to $42M to partially fund the acquisition of property in the Rosehill Reserve development. UDF V was entitled to 100% of all profits up to $6 million. The agreement was modified on October 12, 2016. The outstanding balance was $26.4 million. The borrower entered into a new first lien loan for $24.9 million with a different lender. UDF V had to subordinate its loan, and its profit participation was reduced. Again, this was directly caused by Defendants' anonymous posts.

In his affidavit, Moayedi averred that Hayman's posts and statements caused development projects Centurion had planned with UDF to fall through. Moayedi attested:

> • "In response to the anonymous posts, Centurion suspended entering into any new loans with UDF because of the extreme negative reaction to the posts from Centurion's lenders, homebuilder clients, and other third parties. For example, prior to December 10, 2015, Centurion had intended to borrow

---

[12] In his affidavit, Greenlaw describes in detail the activities performed by attorneys, law firms, accounting firms, and the public relations firm. Attached to Greenlaw's affidavit are press releases, invoices, and legal bills pertaining to these professional services.

money from UDF in connection with the Mercer Crossing project in Farmers Branch. However, because of the package of the anonymous posts and Hayman Capital's publications that was provided to the Mayor and the resulting controversy that ensued as to whether UDF's business was a Ponzi scheme, I had to remove UDF as a lender in that project in order to obtain project approval. The Farmers Branch Mayor and City Council explicitly raised with me some of the same allegations in that package of posts and publications,[13] specifically that UDF was a Ponzi scheme in order to pressure me to remove UDF as a lender on the project, which I did. As reflected in the attached article in the *Dallas Morning News*, Centurion is moving that project forward successfully today with other lenders."

- "Centurion's loan balance with UDF steadily decreased since the anonymous posts. But for the assertions in the anonymous posts [and] the intense negative reaction of Centurion's lenders, homebuilder clients, and others, Centurion would have continued entering into new loans with UDF. As of December 10, 2015, there was an extensive pipeline of new projects where Centurion and UDF had planned to work together as developer and lender, amounting to hundreds of millions of dollars. Unfortunately, after December 10, 2015, none of those new projects went forward with UDF as lender."

Hayman's statements also "caused UDF to lose new clients (borrowers) that would have become clients of UDF" if Hayman had not falsely attacked UDF's business. Greenlaw averred:

David Weekley is the largest private homebuilder in the United States. Prior to Defendants' attacks, it had financed projects in Austin and Orlando with UDF IV, and was looking to do more projects with UDF. After the Bass attacks, Weekley changed course, paid off all outstanding UDF loans in full and ceased doing business with UDF.

Another example provided by Greenlaw involved True Homes:

True Homes is the largest builder in North Carolina (Charlotte). An affiliate of True Homes did two loans with UDF IV, which have both been repaid in full. After December 2015, it did not do any new business with us, although there were several True Homes projects in UDF's pipeline in December 2015. It is my understanding based upon UDF's discussions with this builder that it would do business with UDF if it had the capital.

In an affidavit attached to UDF's response to Hayman's motion to dismiss, Andrew Christofferson, Chief Business Development Officer for Berthel Fisher & Company Financial

---

[13] The Mayor declared that he received a package of anonymous posts and publications and distributed it to the City Council.

Services, Inc. (Berthel), averred that Berthel raised capital for UDF from October 2014 until Christofferson read Hayman's December 10, 2015 post. During that period, Berthel invested over $9 million in UDF V. Berthel was also the exclusive broker raising capital for United Residential Home Finance (URHF) fund, which was wholly owned by United Mortgage Trust. Berthel raised over $8 million in funds for URHF prior to December 10, 2015. Christofferson attested that "in direct response" to the "negative statements about [UDF]", including Hayman's statements that "UDF's business was a Ponzi scheme instead of a genuine real estate business and that UDF's business was generating returns that were not legitimate," Bethel "halted all sales to our customers of UDF V and URHF."[14]

In an affidavit attached to UDF's response to Hayman's motion to dismiss, Michael De Pol, founder and Chairman of the Board of Nationwide Planning Associates, Inc. (Nationwide)— an independent securities broker-dealer and full-service financial planning firm—averred that as of December 2015, several of Nationwide's clients were invested in UDF IV, and Nationwide also was raising capital for UDF V. From August 2015 through early December 2015, Nationwide's clients invested $2,133,500 in UDF V. "In November 2015 alone, [Nationwide] had $1,233,000 in UDF V sales." After reading Hayman's article on December 10, 2015, De Pol and Nationwide became concerned "because of the strong negative statements in the post about UDF's business. Of particular concern to Nationwide and our clients were the statements that asserted that UDF's business was a Ponzi scheme instead of a genuine real estate business and that UDF's business was generating returns that were not legitimate." "In direct response" to Hayman's statements, Nationwide "immediately stopped all sales of UDF V." Nationwide also canceled a pending sales

---

[14] A copy of Christofferson's December 11, 2015 email reflecting Berthel's decision to "immediately halt sales of UDF V and URHF" was attached to his affidavit.

ticket in the amount of $150,000 that had been sent on December 10, 2015 before De Pol became aware of the post.[15]

*Hayman's Statements Caused UDF to Lose the Opportunity to Participate In and "Fund the Projects in Its Pipeline"*

In contrast with the hundreds of millions of dollars in loans generated by UDF prior to Hayman's posts, Greenlaw averred, "For over a year from the beginning of the attacks, UDF did not have any new business. From December 31, 2015 through April 19, 2017, UDF only originated $31 million in new loans."

> Prior to December 10, 2015, Centurion financed approximately 30% of its loans with various UDF entities. As of September 30, 2015 Centurion had outstanding loans from UMT ($3 million), UDF I/II ($57 million), UDF III ($204 million), UDF IV ($386 million) and UDF V ($29 million). In direct response to Defendants' attack, beginning in December 2015, Centurion had to sell off or refinance assets to repay UDF approximately $167 million. This was required mainly due to the banks' withdrawal of UDF's credit[.]
>
> Centurion also had hundreds of millions of dollars in projected borrowing in the pipeline. Since the attack, Centurion has largely turned to other sources of financing to replace UDF, as stated in the Affidavit of Merhdad Moayedi.
>
> One of the Centurion projects that UDF lost out on was Mercer Crossing. If not for the Defendants' attacks, Centurion would have financed parts of that project with UDF. Centurion has been successfully developing that project with other financing sources.

In an affidavit attached to UDF's response to Hayman's motion to dismiss, Joseph Straub, the president and a partner of Harris & Straub LLC (H&S)—a residential and commercial real estate developer—averred H&S worked with UDF entities on several specifically identified H&S development projects. Straub attested that on November 12, 2015, H&S reached an agreement with UDF III, UDF IV, and URHF regarding an additional specifically identified development

---

[15] A copy of the December 11, 2015 email reflecting the cancelation of the $150,000 UDF V investment was attached to De Pol's affidavit.

transaction.[16]  UDF was to fund the development.  Straub also granted UDF options to purchase specifically identified acres of land or equity interests in the H&S company that owned the land.[17]  Straub's affidavit described the transaction in detail.  "[A]s a result" of Hayman's December 10, 2015 post and other posts and "negative statements" by Hayman about UDF—"especially the statements that asserted that UDF's business was a Ponzi scheme instead of a genuine real estate business, that UDF'S business was generating returns that were not legitimate, that UDF had failed to disclose a disagreement between it and Whitley Penn about UDF's financials that caused Whitley Penn's termination as UDF's auditor, that the auditor and UDF were concealing known reportable events, that UDF was taking advantage of its investors as gullible victims, and other statements made throughout various posts"—H&S did not move forward on the development project with UDF.[18]

UDF's petition alleges many of the facts attested to in these affidavits regarding specific pecuniary, economic, and business losses it sustained as a direct result of Hayman's statements.  The petition further alleges that UDF IV's stock price dropped by thirty-five percent on December 10, 2015, after Hayman published its article, "A Texas-Sized Scheme Exposing the Darkest Corner of the REIT Business United Development Funding (UDF)."  By December 11, 2015, UDF IV's stock price had fallen by almost fifty percent, and UDF's trading volumes were over ten times its normal average.

**STANDARD OF REVIEW AND APPLICABLE LAW**

The TCPA provides a mechanism for early dismissal of a lawsuit that is "based on, relates to, or is in response to a party's exercise of the right of free speech, the right to petition, or the

---

[16] A copy of the agreement was attached to Straub's affidavit.

[17] Copies of the purchase option agreements were attached to Straub's affidavit.

[18] A copy of a December 15, 2015 email from Straub to UDF "expressing concern" that Hayman's "posts would interfere with UDF's ability to raise capital" was attached to his affidavit.

right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003. Its purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights under the United States Constitution, not to dismiss meritorious lawsuits. TEX. CIV. PRAC. & REM. CODE ANN. § 27.002; *Lipsky*, 460 S.W.3d at 589.

The TCPA provides a burden-shifting framework for resolving TCPA motions to dismiss. *Lipsky*, 460 S.W.3d at 586–87; *Misko v. Johns*, No. 05-18-00487-CV, 2019 WL 1930157, at \*3 (Tex. App.—Dallas May 1, 2019, pet. filed); *Dyer*, 573 S.W.3d at 424. The initial burden lies with the defendant-movant to show by a preponderance of the evidence that the plaintiff's claim is "based on, relates to, or is in response to the [movant's] exercise of" its First Amendments rights. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b); *Lipsky*, 460 S.W.3d at 586. If the movant satisfies its burden to show a claim is covered by the TCPA, the second step shifts the burden to the plaintiff to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587.

A "prima facie case" refers to "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. Dupont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)). "Clear and specific" evidence is evidence that is "unambiguous," "free from doubt," and "explicit" or "referring to a particular named thing." *Lipsky*, 460 S.W.3d at 590 (quoting *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). Thus, the term "clear and specific" pertains to the quality of evidence required to establish a prima facie case; and the term "prima facie case" pertains to the amount of evidence necessary for a plaintiff to carry its minimal factual burden to support a rational inference establishing each essential element of the its claim. *See Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 882 (Tex. App.—Austin 2018, pet. filed).

In *Lipsky*, the Texas Supreme Court explained how this evidentiary standard should be applied:

> [M]ere notice pleading—that is, general allegations that merely recite the elements of a cause of action—will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim.

460 S.W.3d at 590–91 (internal citations omitted). The plaintiff may rely on circumstantial evidence that creates an inference establishing a central fact unless the "connection between the fact and the inference is too weak to be of help in deciding the case." *Dallas Morning News, Inc. v. Hall*, No. 17-0637, 2019 WL 2063576, at *4 (Tex. 2019) (quoting *Lipsky*, 460 S.W.3d at 589); *see also Lipsky*, 460 S.W.3d at 590–91 (TCPA "does not impose a higher burden of proof than that required of the plaintiff at trial [and does not] require direct evidence of each essential element of the underlying claim to avoid dismissal.").

If the plaintiff establishes a prima facie case, the burden shifts back to the defendant to establish, by a preponderance of the evidence, each essential element of a valid defense to the plaintiff's claim.[19] TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). The trial court must dismiss the action if the plaintiff fails to carry its burden or the defendant establishes the essential elements of a valid defense. *Id.* § 27.005(b), (c), (d).

We review de novo a trial court's ruling on a motion to dismiss under the TCPA. *Dyer*, 573 S.W.3d at 424; *Campbell v. Clark*, 471 S.W.3d 615, 623 (Tex. App.—Dallas 2015, no pet.). In conducting our review, we consider the pleadings and evidence in a light most favorable to the

---

[19] Hayman does not assert on appeal that it established by a preponderance of the evidence each essential element of a valid defense, and Hayman did not make any such argument in its motion to dismiss or in its reply brief in the trial court. Our inquiry therefore ends after we determine whether UDF satisfied its burden to state a prima facie case for the challenged elements of its claims preserved for our review. We need not reach the question presented in a case where the TCPA movant "establishes by a preponderance of the evidence each essential element of a valid defense" as being an unconstitutional deprivation of the right to trial by jury. TEX. CONST. art. V, § 10 (right to have a jury resolve fact questions).

nonmovant.[20] *Lei v. Nat. Polymer Int'l Corp.*, No. 05-18-01041-CV, 2019 WL 2559756, at *3 (Tex. App.—Dallas June 21, 2019, no pet. h.); *Dyer*, 573 S.W.3d at 424*; see also Deuell*, 508 S.W.3d at 685.

## ANALYSIS

On appeal, UDF does not contend its claims do not fall within the scope of the TCPA. Assuming, without deciding, that the TCPA applies to this case, we therefore proceed to determine whether UDF met its burden to point to clear and specific evidence establishing a prima facie case for the challenged elements of its causes of action preserved for our review. UDF maintains it provided more than sufficient—and even overwhelming—evidence detailing the factual basis of its claims, and the trial court properly denied Hayman's motion to dismiss. As relevant to this appeal, Hayman argues UDF failed to point to clear and specific evidence for the falsity, actual malice, causation, and damages elements of its claims.

### Falsity of Statements

Hayman contends UDF failed to satisfy its burden to point to clear and specific evidence that Hayman's publications were false. A publication is false if it is not substantially true. *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013). A publication is not substantially true if, taken as a whole in light of the surrounding circumstances, it is more damaging to the plaintiff's reputation than a truthful publication would have been. *See id.*; *see also KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 711 (Tex. 2016). The supreme court refers to "this meaning as the statement's

---

[20] Section 27.006 of the TCPA, entitled "Evidence," provides that "[i]n determining whether a legal action should be dismissed . . . the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006; *see also Breakaway Practice, LLC v. Lowther*, No. 05-18-00229-CV, 2018 WL 6695544, at *2 (Tex. App.—Dallas Dec. 20, 2018, pet. filed) (mem. op.). Under this provision, pleadings are to be considered as evidence, regardless of whether they are offered as such. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (under TCPA, trial court obliged to consider pleadings irrespective of whether formally offered as evidence); *Breakaway Practice*, 2018 WL 6695544, at *2; *Martin v. Bravenec*, No. 04-14-00483-CV, 2015 WL 2255139, at *7 (Tex. App.—San Antonio May 13, 2015, pet. denied) (mem. op.) (noting section 27.006(a) is exception to general rule that pleadings are not evidence); *see also Walker v. Hartman*, 516 S.W.3d 71, 79 (Tex. App.—Beaumont 2017, pet. denied) (pleadings are considered "as evidence" under TCPA).

'gist'." *Id.* at 721. We therefore evaluate a statement's falsity by first ascertaining its gist. *See Neely*, 418 S.W.3d at 63–64.

The gist of a statement is its "main point" or its "essence." *D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 482 (Tex. App.—Dallas 2015), *aff'd in part on other grounds, rev'd in part on other grounds*, 529 S.W.3d 429 (Tex. 2017). We determine a statement's gist by examining "how a person of ordinary intelligence would view it." *KBMT Operating Co.*, 492 S.W.3d at 711 (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)). A publication can convey a false and defamatory meaning by omitting or juxtaposing facts, "even though all [of the publication's] individual statements considered in isolation were literally true or non-defamatory." *Turner*, 38 S.W.3d at 115.

In this case, the parties dispute many of the facts underlying UDF's claims. Each party accuses the other of mischaracterizing facts. The parties also disagree on how this Court should apply the standard under which UDF's clear and specific evidence is measured. UDF's claims are premised on its allegations that Hayman flooded the news wire with (1) explicitly false and defamatory statements about UDF's business, and (2) statements that as a whole created a false and defamatory impression of UDF's business by misstating facts, mischaracterizing facts, omitting facts, and presenting facts in a misleading context. According to UDF, the gist of Hayman's statements was that UDF was an illegitimate business with nefarious motives, was not engaged in loaning funds for bona fide real estate development, was operating a Ponzi scheme predicated on fictitious returns, and essentially was a worthless "billion dollar house of cards." UDF complains that Hayman's repeated assertions likening UDF's business to a Ponzi scheme constituted a "factual assertion [that] was conveyed by numerous individual statements of fact that were also false, such as that UDF's largest borrower was insolvent, that Shahan Prairie was not a real development, and that UDF's business did not generate cash." As a direct result of Hayman's

false and defamatory posts, UDF alleges it suffered hundreds of millions of dollars in special damages including lost profits, loss of credit, loss of investor capital, loss of existing and future business, and out-of-pocket costs.

Hayman asserts that the overall "gist" of its posts was substantially true, and that its posts should be considered in conjunction with allegations in a complaint filed by the SEC against UDF and allegations by a "homebuilder" in "a recently-filed lawsuit against UDF." It is not the trial court's role, however, to act as a factfinder and to resolve opposing reasonable inferences in determining whether the plaintiff satisfied the prima facie proof requirement. *See Berry v. ETX Successor Tyler, f/k/a E. Tex. Med. Ctr.*, No. 12-18-00095-CV, 2019 WL 968528, at *7 (Tex. App.—Tyler Feb. 28 2019, no pet.) (mem. op.). Instead, the court must determine whether the non-movant met its TCPA burden to produce evidence sufficient to present a prima facie case, some of which may include relevant evidence from which more than one reasonable inference may be drawn. *See id.*

In *Lipsky*, the court underscored that the TCPA "does not impose a higher burden of proof than that required of the plaintiff at trial." *Lipsky*, 460 S.W.3d at 591. A plaintiff may prevail at trial by offering sufficient evidence to support a fact finding in its favor, even if the defendant offered conflicting evidence. *See United Servs. Auto Ass'n v. Croft*, 175 S.W.3d 457, 463 (Tex. App.—Dallas 2005, no pet.) ("When the evidence is conflicting, the jury's verdict on such matters is generally regarded as conclusive. . . . Accordingly, if there is sufficient competent evidence of probative force to support the finding, it must be sustained."). Therefore, following our precedent, we only consider the pleadings and evidence in favor of the plaintiff's case when determining whether it established the requisite prima facie proof. *Apple Tree Café Touring, Inc. v. Levatino*, No. 05-16-01380-CV, 2017 WL 3304641, at *2 (Tex. App.—Dallas Aug. 3, 2017, pet. denied) (mem. op.); *Moldovan v. Polito*, No. 05-15-01052-CV, 2016 WL 4131890, at *5 (Tex. App.—

–30–

Dallas Aug. 2, 2016, no pet.) (mem. op.) (quoting *Rosenthal*, 475 S.W.3d at 480–81); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) (issue is whether claimant established prima facie case for each essential claim). It is not this Court's province to consider and weigh evidence submitted by Hayman to contradict UDF's evidence. *Moldovan*, 2016 WL 4131890, at *5.

Hayman also contends UDF mischaracterizes its internet posts. Sidestepping the allegation that Hayman accused UDF of operating a Ponzi scheme, Hayman protests:

> [Hayman] never stated that UDF was running a traditional Ponzi scheme; instead, [Hayman] accused UDF of exhibiting Ponzi-like characteristics insofar as it appeared that UDF was using capital raised in connection with newer UDF funds to directly or indirectly fund distributions to investors in older UDF funds[.]

Hayman's objection that the gist of, for example, Bass' accusation that UDF was "perpetuating a Ponzi-like real estate scheme across multiple funds" and was "obscur[ing] the fact [it was] using new investors' money to make payments to existing investors" was substantively different from stating that UDF was operating a "traditional" Ponzi scheme, is disingenuous.

UDF adduced clear and specific evidence demonstrating that a reasonable person would—and did—conclude Hayman's posts were an exposé of wrongdoing at UDF. Affidavits and evidence attached to UDF's response to Hayman's motion to dismiss demonstrate Seeking Alpha, Citron Research, Value Walk, Origin Bank, Legacy Texas Bank and Brown, Berthel and Christofferson, H&S and Straub, Nationwide and De Pol, and Kitchens all read Hayman's statements as an accusation that UDF's business was a Ponzi scheme on the verge of collapse. For example, immediately after and "based wholly on [Hayman's] anonymous [December 10] post," Seeking Alpha, ValueWalk, and Citron Research published their own press spreading Hayman's news that UDF was misleading and defrauding investors; UDF was operating a Ponzi scheme; and UDF was a worthless and illegitimate business.

–31–

Seeking Alpha posted an article titled, "*Ponzi scheme Alleged at United Development Funding*." ValueWalk posted an article referring to Hayman's post about UDF as a thesis "on why the stock is a zero." Value Walk tweeted that Bass thinks UDF "is a *total Ponzi scheme*." Citron Research circulated Seeking Alpha's article with the title "*udf ponzi can Go to $0*." StreetInsider re-published the Seeking Alpha and Citron Research tweets.

UDF's lead banker also read Hayman's article as a condemnation of UDF as an illegitimate Ponzi scheme. In her affidavit, Brown averred:

> [Hayman's] post caused widespread concern at the Bank[,] especially the statements that asserted that **UDF's business was a Ponzi scheme instead of a genuine real estate business**, that **UDF's business was generating returns that were not legitimate**, that **UDF had failed to disclose a disagreement between it and Whitley Penn about UDF's financials** that caused Whitley Penn's termination as UDF's auditor, that **the auditor and UDF were concealing known reportable events**, that UDF was taking advantage of its **investors as gullible victims**, and similar statements made throughout the December 10 internet post.[21]

Brown believed, "[Bass] had distorted and misrepresented [facts] **to create the impression UDF's business was operating in a fraudulent manner based on phony real estate developments that did not generate legitimate returns**."[22]

UDF's petition and the affidavits attached to UDF's response to Hayman's motion to dismiss identify additional incriminating statements by Hayman:

- The Penn letter asserted accounting irregularities at UDF and stated UDF's relationship with Centurion was improper and part of an overall scheme to misappropriate money from shareholders: "Loans to UDF IV's largest borrower, Centurion, do not appear to be arm's-length transactions."

- The Penn letter accused UDF of violating auditing standards: "UDF III, UDF IV and UDF V fail to fully disclose the business relationships between their officers and directors and Centurion as required by Auditing Standard No 18—Related Parties."

---

[21] Emphasis added.

[22] Emphasis added.

- The Penn letter claimed Centurion was not creditworthy, did not have the ability to pay "585 million in debt" as well as "approximately $75 million [of] annual interest expense," and "may be insolvent."

- Hayman claimed, "100% of UDF IV loans are classified as fully collectible, which is likely a material misrepresentation if the largest borrower is insolvent."

- Hayman asserted that Centurion was not a "seasoned and accomplished" developer and that its loans were "irregular," "non-performing," and not at "arms' length."

- Hayman claimed Centurion's average interest rate of 13% was "more than double the current market average for development loans."

- Hayman declared, "[S]hareholders in UDF's public companies are being victimized by a Ponzi-like real estate scheme"; and "Our research showed that UDF exhibited characteristics consistent with a Ponzi scheme, the size and scope of which exceeded a billion dollars."

- Hayman claimed UDF was a "billion dollar house of cards" that was "now on the verge of collapse," and that UDF "faces significant bankruptcy risk, which would leave its shares virtually worthless," and "UDF is using new investor money to pay existing investors."

- Hayman published multiple articles with spectacular and damning titles, including: "A Texas-Sized Scheme," "Exposing the Darkest Corner," "How the Scheme Works," and "United Development Funding (UDF) One Example of Many: How the Scheme Works, from One UDF Fund to the Next."

Properly evaluating Hayman's posts as a whole in light of the surrounding circumstances, and based upon how a person of ordinary intelligence would perceive them, we conclude that a reasonable view of the gist of Hayman's posts and statements is that UDF was running a Ponzi scheme predicated on fictitious returns, was an illegitimate business on the verge of collapse, was issuing loans to developers who were not actually developing real estate projects, and was duping gullible investors into purchasing its worthless stock.

UDF also adduced clear and specific evidence that Hayman's disparaging statements about UDF's business were false; UDF was a viable, legitimate business, with real earnings and gains; and UDF was engaged in growing real estate investments that were paying real dividends:

–33–

- In his affidavit, Kitchens averred that UDF's returns were not fictitious, UDF was not involved in an unlawful fraudulent scheme to generate fictitious returns, and investor money was not misappropriated, but rather used for legitimate business opportunities typically secured by bona fide real estate.

Kitchens averred, "UDF's business never should have been characterized as a Ponzi scheme or Ponzi-like scheme by [Hayman] as there was no basis for doing so."

Kitchens' affidavit explained in detail why Hayman's accusation that UDF was running a Ponzi scheme was false. For example, Kitchens averred, "at the time of Hayman['s] December 10, 2015 anonymous post and thereafter, *Hayman Capital omitted the facts that each UDF IV loan was backed by specific collateral, the value of which was regularly appraised by independent appraisers in order to secure the loan, as disclosed in its 2014 10-K.*"

Kitchens averred, "*UDF IV's SEC filings showed that it was in fact generating cash, and, moreover, its generation of cash had been steadily increasing.*"

Kitchens averred, "Hayman Capital asserts that the facts in the '*Irregular Patterns*' posting were grounded in its review of SEC filings, including its Forms 10-K; that its information was 'sourced directly from UDF IV tabular disclosures'; and that those eleven loans are 'representative of loans to [Centurion]' and that 'significantly more loans demonstrate irregularities.' [To] create its eleven examples for its '*Irregular Patterns*' posting, Hayman Capital extracted from a much larger table, within UDF IV's 10-K filing, that disclosed the data for UDF V's cash receipts; *specifically, Hayman Capital extracted loans that were not generating cash receipts while omitting dozens of loans that were generating cash receipts, as shown on the 10-K from which Hayman Capital sourced its data.*"

- In his affidavit, Greenlaw averred that Centurion was not insolvent, it was able to service its debt and interest expense, and it had repaid "hundreds of millions of dollars [of loans] to UDF."

- In his affidavit, Moayedi averred, "Centurion has had no involvement in any Ponzi scheme" and "UDF is a legitimate business and it is not a Ponzi scheme." Moayedi further averred that Centurion was not insolvent, and UDF's loans to Centurion generated cash by repaying principal and accrued interest when a project was completed and sold.

- Centurion's CEO, UDF's CEO and Kitchens all attested that UDF's loans to Centurion "were market rate."

- In her affidavit, Brown averred that Hayman's allegations were "not consistent with [her] experience with and knowledge of UDF's business," and that she "regularly reviewed UDF's collateral and related project

developments and found the collateral to be sound and the project developments to be consistent with what would be expected of any comparable borrower."

- A letter to the SEC from Whitley Penn confirmed that it stood by its audits of UDF and that it had no disagreements with UDF "on any matters of accounting principles or practices, financial statement disclosure of auditing scope or procedure."

Considering the pleadings and evidence in a light most favorable to UDF, the nonmovant, *Dyer*, 573 S.W.3d at 424, we conclude that UDF met and exceeded its burden to point to clear and specific evidence establishing a prima facie case that Hayman's disparaging statements about UDF's business were false.

## Actual Malice

Having concluded that UDF satisfied its burden to establish a prima facie case that Hayman's internet posts were false, we now turn to Hayman's contention that UDF failed to point to clear and specific evidence establishing a prima facie case of actual malice. UDF responds that the actual malice standard does not apply because it is not a general-purpose public figure, and, in any case, its pleadings establish a prima facie case of actual malice. For purposes of this interlocutory appeal, we assume—without deciding—that UDF is a general-purpose figure, because we agree that UDF established a prima facie case of actual malice.

To establish actual malice, UDF must show that a defamatory statement was published either with knowledge of its falsity or with reckless disregard as to its truth. *See Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex. 2005) (per curiam). The standard for reckless disregard is subjective and focuses on the conduct and state of mind of the defendant. *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). Reckless disregard requires more than mere negligence or "a departure from reasonably prudent conduct." *Id.* (quoting *Harte–Hanks Comms., Inc. v. Connaughton,* 491 U.S. 657, 688 (1989)). It requires evidence that the defendant "entertained serious doubts as to the truth of the article at the time it was published" and had a "high degree of

awareness" of the probable falsity of the statements. *Id.* (quoting *Harte–Hanks,* 491 U.S. at 688). Recklessness also "may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Bentley*, 94 S.W.3d at 596.

While profit motive, alone, is not sufficient to establish actual malice, it is a relevant factor to be considered together with other factors in a determination of actual malice. *See Hearst Corp.*, 159 S.W.3d at 639 ("A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered.") (citing *Bentley,* 94 S.W.3d at 596). Moreover, a plaintiff can establish actual malice when the defendant purposefully avoids the truth. *See Hearst Corp.*, 159 S.W.3d at 637–38.

A defendant's state of mind "can—indeed, must usually—be proved by circumstantial evidence." *Bentley*, 94 S.W.3d at 596; *see also Lipsky,* 460 S.W.3d at 584 (concluding "clear and specific evidence" under the TCPA "includes relevant circumstantial evidence"). Proof of actual malice is not defeated by a defendant's self-serving protestation of sincerity. *Bentley*, 94 S.W.3d at 596. And the evidence must be viewed in its entirety. *Id*.

Here, the parties' arguments respecting actual malice revolve, in part, around their differing characterizations of the quality of Hayman's investigation before publication of its alleged false statements. Hayman insists it "spent approximately a year researching a wide variety of sources," and UDF "fail[ed] to establish" that Hayman did not "honestly believe" that the gist of its statements was true. Hayman also professes it, "at most[,] 'drew different conclusions' from publicly-available sources," and UDF's claims are no more than a disgruntled quarrel with Hayman's "interpretation" of the facts.

Conversely, UDF claims Hayman's plan from the outset was to look for and publish only those facts designed to effectuate a nosedive of UDF's stock price. To that end, Hayman purposefully avoided facts that did not support its plan to profit from the extraordinary short

positions it took against UDF—a company that "had consistently traded in a narrow range of low volume" and "pretty much flew below the radar" before Hayman's posts. *See id.* (explaining that actual malice occurs when a party purposefully avoids the truth, avoids sources to verify its allegations, or bases a statement on obviously dubious information.) In its response to Hayman's motion to dismiss, UDF argued:

- Hayman's posts were part of a "master plan to profit more than $85 million dollars from the demise of UDF, as well as to profit from shorting other stocks [Hayman] believed would crash along with UDF."

- In addition to taking out a $59 million short position in UDF IV, Hayman "had a detailed plan to push all UDF entities into bankruptcy and buy their bank debt and assets at a discount," with "expect[ed] gross returns of $50 to $90 million" resulting in "total fees to [Hayman Capital] of $15–25 million."[23]

According to UDF, public information Hayman claims to have thoroughly reviewed and relied upon, including statements in UDF's SEC filings, contradicted Hayman's accusations and evinces Hayman's actual malice. In his affidavit, Kitchens averred:

Material that Hayman Capital identifies as being part of its review actually contradicts its false statements . . . . For example, UDF's SEC filings show that its cash receipts on development projects were steadily increasing, which is inconsistent with a Ponzi scheme. Hayman Capital disregarded this evidence that UDF's business was not a Ponzi scheme and instead made statements asserting that UDF's business was not generating cash receipts.

Likewise, Greenlaw averred that Hayman's statements that Centurion was insolvent and unable to pay UDF's loans are contradicted by UDF IVs public filings, which establish that Centurion made significant cash payments.

Greenlaw also attested that public information contradicted Hayman's statements that UDF's former auditor resigned because of a disagreement with UDF regarding UDF's financial reporting.

---

[23] *See Hearst Corp.*, 159 S.W.3d at 639 (injurious motive is "not alone proof of actual malice," but is among the "factors to be considered").

[Hayman's] premise that Whitley Penn's decision not to stand for reappointment was evidence of fraud is directly contradicted by Whitley Penn's November 24, 2015 letter to the SEC which states that its decision had nothing to do with any disagreements with UDF, and that Whitley Penn stood by UDF's financial statements that Whitley Penn previously audited.

It is not incumbent upon this Court to decide whether Hayman's statements were actually false to resolve this appeal. UDF can prevail here if there is some evidence Hayman published its posts and statements with actual malice. *See Hearst Corp.*, 159 S.W.3d at 637. Hayman employed sensationalized, attention-grabbing headlines raising the specter of a billion dollar Ponzi scheme that was about to implode, supporting a rational inference that Hayman wanted to draw traffic and attention to its posts:

- "**PARTICIPANTS IN UDF's PONZI-LIKE REAL ESTATE SCHEME**"

- "**Shareholders in UDF IV and UDF's other [REITs] are being victimized by UDF management's Ponzi-like real estate scheme**"

- "**United Development Funding (UDF) One Example of Many: How The Scheme Works, from One UDF Fund to the Next**"

- "**THE UDF STRUCTURE IS A BILLION DOLLAR PROBLEM**"

- "**CRACKS IN UDF'S FAÇADE ARE STARTING TO SHOW**"

- "**ANATOMY OF A BILLION DOLLAR HOUSE OF CARDS THE CASE AGAINST UDF IV**"

The body of Hayman's posts buttressed its headlines with accusations and photographs purporting to show that UDF was a Ponzi scheme on the verge of collapse and its stock could go to zero: "UDF faces **significant bankruptcy risk,** which would leave its shares virtually worthless," "The research on this website exposes how a Texas real estate developer built a billion dollar house of cards and why it is now on the verge of collapse."

Hayman's initial anonymous posts on a website it created using a false name further indicate its state of mind. UDF offered sufficient evidence to support a fact finding that Hayman did not want to be identified as the publisher of the posts challenging the legitimacy and legality

–38–

of UDF's business so that its statements would be more certain to plunge UDF's stock value, resulting in a huge profit to Hayman, which, in fact, is what happened. *See Croft*, 175 S.W.3d at 463. UDF's petition alleges:

> Between October 19, 2016 and October 27, 2016, upon information and belief, [Hayman] closed out the vast majority of their short positions in UDF IV, purchasing the shares as low as $1.00. Given that, upon information and belief, [Hayman] took out a short position of approximately 4 million shares when UDF IV was trading over $17, [Hayman] would have profited up to $16 per share on this position . . . for a profit of more than $60 million.

UDF adduced clear and specific evidence that public information, including information Hayman claims to have researched and reviewed, contradicted many of Hayman's statements and was inconsistent with Hayman's overall narrative that UDF was a Ponzi scheme and an illegitimate, worthless business that was colluding with Centurion to bilk gullible investors. At the least, this is circumstantial evidence that Hayman purposefully avoided the truth and posted its statements subject of this lawsuit with reckless disregard for the veracity of its individual statements as well as the gist of the entirety of its publications. *See Lipsky*, 460 S.W.3d at 594 (even if individual statements are not actionable, the gist "depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements") (quoting *Bentley*, 94 S.W.3d at 579).

This evidence supports a rational inference that Hayman intended to interfere with UDF's economic interests by publishing and disseminating unconfirmed, false, and derogatory statements about UDF's business that were almost certain to have a severe negative impact on UDF's current and prospective business and on UDF's stock value; and Hayman deliberately distorted facts, omitted facts contrary to its "story," and purposefully avoided discovering facts that might show the falsity of its accusations. *See Hearst Corp.*, 159 S.W.3d at 637—39.

–39–

We conclude that UDF met its burden under the TCPA to point to clear and specific evidence establishing that Hayman's allegedly false and disparaging statements about UDF's business were made with actual malice.

## Causation of UDF's Damages

Hayman argues UDF failed to state a prima facie case that its statements and actions were the proximate cause of UDF's alleged damages. According to Hayman, "[UDF has] not pointed to any evidence to suggest that it was [Hayman's] posts, and not the other concerning news around the same time, that were the proximate cause of the loan restructurings, loss of credit and other damages that [UDF has] alleged." Bass, however, admitted in his affidavit that "Hayman directed its statements" about UDF's business "to the public marketplace," and he intended this "critical information" to reach "stakeholders including investors, financial institutions, lenders, auditors, and investigative authorities related to a matter of public concern, notwithstanding Hayman having a financial interest in the situation."

In response, UDF points to prodigious fact allegations in its petition and affidavits illustrating how Hayman's alleged false statements caused direct pecuniary and economic losses to UDF—"evidence [that] goes much further than in most anti-SLAPP appeals."

A TCPA non-movant is not required to adduce all of the evidence that it would or could present at trial as to the existence of damages or the amount or constituent parts of its damages. *See Lipsky*, 460 S.W.3d at 590–91 (pleadings and evidence showing factual basis for claim is sufficient to meet TCPA burden). UDF was only required to adduce evidence supporting a rational inference as to the existence of its damages. *Id.* at 590 (TCPA non-movant only required to adduce evidence supporting rational inference that fact allegations are true). UDF has gone much further than necessary.

In affidavits attached to its response to Hayman's motion to dismiss, UDF witnesses as well as third-party business partners, customers, lenders, and a forensic accounting expert attested to the damages sustained by UDF. Greenlaw averred that UDF incurred fees and expenses for attorneys, law firms, accountants, and other professionals for specified services required as a result of the fallout from Hayman's statements, including increased insurance and accounting expenses, legal bills submitted by banks for research conducted to confirm their collateral, and attorney's fees in connection with modifications to loan agreements lenders required as a direct result of Hayman's attack. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 161 (Tex. 2014) (special damages recoverable for business disparagement claim includes out-of-pocket expenses, such as consultant expenses, to remedy effects of disparaging publication).

Greenlaw detailed a number of specific examples of UDF's loss of credit, loss of access to credit, and modification of UDF's loan agreements—including with Legacy Texas Bank, Origin Bank, and Independent Bank—directly resulting from Hayman's statements and actions. Greenlaw attested that UDF lost investor capital as a direct result of Hayman's statements, including a planned $1 billion capital raise. Greenlaw averred that as a direct result of Hayman's statements, "several True Homes projects in UDF's pipeline in December 2015" fell through; UDF lost Centurion development projects, including "Mercer Crossing"—which Moayedi confirmed in his affidavit; and other clients "looking to do more projects with UDF," such as David Weekley Homes, "ceased doing business" with UDF.

Brown from Legacy Texas Bank, Christofferson from Berthel, Strub from H&S, and De Pol from Nationwide all averred that as a direct result of Hayman's statements—particularly Hayman's charges that UDF was a Ponzi scheme and not a genuine real estate business, UDF was not generating legitimate returns, and Whitley Penn and UDF were concealing known reportable events—they halted and ceased conducting business with UDF; they canceled planned projects

with UDF; they canceled pending sales tickets with UDF; they terminated revolving lines of credit with UDF; and they terminated outstanding loans with UDF. Their affidavits were supported by copies of contracts, agreements, modifications to contracts and agreements, termination of agreements, cancelation of customer orders, and correspondence memorializing modifications, cancelations, and terminations of orders, agreements, and contracts.

UDF did not make mere general averments as to its alleged damages proximately caused by Hayman's statements. To the contrary, UDF described its damages with specificity, naming the parties to and the terms of the contracts and agreements, stating the value of the contracts and agreements, and providing the amount of damages UDF sustained. UDF backed up its damages claims with affidavits and documentary evidence. When we consider the evidence described above in a light favorable to UDF, the non-movant, as we are required to do, that evidence is sufficient to support a rational inference that UDF sustained damages as a direct result of Hayman's false and misleading statements about UDF's business.

We conclude UDF more than met its burden to adduce clear and specific evidence establishing a prima facie case that Hayman's false and disparaging statements proximately caused UDF damages and losses.

**Business Disparagement**

To prevail on a business disparagement claim, a plaintiff must establish: (1) the defendant published false and disparaging information about the plaintiff, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Lipsky*, 460 S.W.3d at 592. Hayman argues the trial court erred by not dismissing UDF's business disparagement claim because UDF failed to point to clear and specific evidence showing Hayman (1) made a false statement, (2) acted with actual malice, or (3) caused UDF's damages.

As explained, *supra*, we conclude UDF satisfied its burden under the TCPA to provide clear and specific evidence establishing that Hayman made a false statement with actual malice that proximately caused UDF's alleged damages and losses. We resolve Hayman's first, second, and third issues against it.

## Tortious Interference with Contract

To prevail on a claim for tortious interference with contract, a plaintiff must establish: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of America v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Hayman argues the trial court erred in denying its motion to dismiss because UDF failed to point to clear and specific evidence establishing Hayman (1) acted with actual malice, (2) interfered with any existing contracts, or (3) caused UDF's damages.

In the trial court, Hayman did not raise its argument on appeal that it did not interfere with UDF's "existing" contracts. Hayman therefore waived that issue for appellate review. *See* TEX. R. APP. P. 33.1; *Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 170 (Tex. App.—Dallas 2009, no pet.). As explained, *supra*, we conclude UDF satisfied its burden under the TCPA to provide clear and specific evidence establishing that Hayman acted with actual malice and proximately caused UDF's alleged damages and losses. We resolve Hayman's fourth issue against it.

## Tortious Interference with Business Relationships
## and
## Conspiracy

To prevail on a claim of tortious interference with business relationships, a plaintiff must show: (1) there was a reasonable probability that the parties would have entered into a business relationship, (2) the defendant committed an independently tortious or unlawful act that prevented

the relationship from occurring, (3) the defendant acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct, and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Hayman argues the trial court erred in denying its motion to dismiss UDF's claim for tortious interference with business relationships "for all the reasons . . . [UDF has] not stated a prima facie claim for business disparagement." Likewise, Hayman argues the trial court erred in denying its motion to dismiss UDF's claims for conspiracy to commit the aforementioned causes of action "because [UDF has] not established a prima facie case on any other claim."

Because we conclude UDF stated a prima facie case for business disparagement, we also conclude UDF satisfied its burden to provide clear and specific evidence establishing a prima facie case for its tortious interference with business relationships claim. Likewise, because we conclude UDF stated a prima facie case for its claims for business disparagement, tortious interference with contract, and tortious interference with business relationships, we conclude UDF satisfied its burden under the TCPA to provide clear and specific evidence establishing a prima facie case for its conspiracy claims. We resolve Hayman's fifth issue against it.

### Post-Hearing Evidence

In its sixth issue, Hayman contends the trial court erred in striking evidence attached to Hayman's post-hearing brief. According to Hayman, the stricken evidence "rebutted eight inaccurate factual statements made by [UDF's] counsel" at the hearing on Hayman's motion to dismiss.

Section 27.005 of the TCPA provides that "[t]he court must rule on a motion under Section 27.003 not later than the 30th day following the date of the hearing on the motion." TEX. CIV.

PRAC. & REM. CODE ANN. § 27.005(a). This deadline is mandatory and gives the trial court no discretion to grant extensions of time. *Avila v. Larrea,* 394 S.W.3d 646, 656 (Tex.App.—Dallas 2012, pet. denied); *see also Direct Commercial Funding, Inc. v. Beacon Hill Estates LLC,* 407 S.W.3d 398, 401 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The trial court's only options are to rule to dismiss or not dismiss the legal action. *Avila,* 394 S.W.3d at 656. Hayman's preferred reason for its post-hearing submission of evidence, *i.e.* the Supplemental Bass Declaration, without leave of the trial court, was to rebut statements made by UDF's counsel at the hearing.

The trial court did not grant Hayman leave to make the late filing. The following exchange occurred at the hearing:

> The Court: [So] here's my question. I had really already reached a ruling before the amended brief was filed. You didn't file another affidavit, did you.
>
> [Hayman's counsel]: We did. We filed a brief affidavit of Kyle Bass with our supplemental briefing.
>
> The Court: Okay. I'm going to strike that. I did not ask for any additional evidence when you were here. . . . I don't allow new evidence to come in after a hearing on something like this. I would never finish, especially when there's a deadline on my ruling.
>
> * * * *
>
> [Hayman's counsel]: . . . . It's the TCPA, which doesn't have any preclusion against filing a supplemental briefing[.]
>
> The Court: I'm not talking about the briefing. I'm talking about the affidavit because I had already considered all the evidence. And I never had anybody file an evidentiary affidavit after a very extensive hearing. . . . [S]o then what would occur would be [UDF's counsel] would then probably have to file additional affidavits, and [then] I wouldn't be able to rule on it by the time of my deadline.
>
> * * * *
>
> The Court: . . . . [I] do have deadlines on this [TCPA motion to dismiss], so it's even more important that there be a deadline on the evidence. . . . So this came as a complete surprise to the Court.

[UDF's counsel]:  And to us.

The trial court confirmed that it had "30 days after the hearing [was] held" to rule on Hayman's motion to dismiss.  Hayman's counsel verified, "The hearing [on the motion to dismiss] had to be held before May 25."  The trial court stated, "[f]or the record I was given . . . nine three ring binders of information to look at, and I can't just keep on adding to it and get a ruling out.  So I'm going to strike the additional evidence."[24]

We conclude the trial court did not abuse its discretion in striking Hayman's post-hearing evidence from the record.

We resolve Hayman's sixth issue against it.  We affirm the trial court's order.


/Ken Molberg/
KEN MOLBERG
JUSTICE


Whitehill, J., concurring without opinion.


180752F.P05

---

[24] In any event, this was merely rebuttal evidence to UDF's prima facie evidence.  As such, we do not consider it. *See Apple Tree Café Touring, Inc.*, 2017 WL 3304641, at *2.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

J. KYLE BASS, ET AL., Appellants

No. 05-18-00752-CV     V.

UNITED DEVELOPMENT FUNDING,
L.P., ET AL., Appellees

On Appeal from the County Court at Law
No. 3, Dallas County, Texas
Trial Court Cause No. CC-17-06253-C.
Opinion delivered by Justice Molberg.
Justices Whitehill and Reichek
participating.

In accordance with this Court's opinion of this date, the order of the trial court denying appellees' motion to dismiss is **AFFIRMED**.

It is **ORDERED** that appellees UNITED DEVELOPMENT FUNDING, L.P., ET AL. recover their costs of this appeal from appellants J. KYLE BASS, ET AL.

Judgment entered this 21st day of August, 2019.